## Ragsdale v. Commonwealth.

(Decided Oct. 8, 1935.)

T. C. CARROLL and C. M. C. PORTER for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant was tried in the Bullitt circuit court for the murder of C. K. Kneisler, convicted of manslaughter, and sentenced to fifteen years in the penitentiary. He appeals.

A reversal of the judgment is asked because of the alleged erroneous instructions and that the verdict is against the law and the evidence.

The facts produced for the commonwealth are, substantially, as follows:

Appellant and Kneisler, the deceased, lived on adjoining farms, and on the morning of the killing Leroy Edwards, a hired man of the deceased, went to deceased's barn to feed and milk the cows, and a heifer which belonged to appellant came through the gate and was interfering with the cows Edwards was feeding, and Kneisler told Edwards to put the heifer in the barn, which he did, and later he told Edwards to go tell the appellant that his heifer was in his barn. In a few minutes appellant went to deceased's place, where the deceased and Edwards were working, and asked about his heifer, and deceased told him the heifer was in the barn. At this time Edwards was plowing and deceased was pitching hay with a pitchfork. Appellant and deceased started walking toward the barn and deceased had the pitchfork over his shoulder. They were engaged in conversation, but Edwards said he did not hear what was said, but he saw no indications of any ill feeling or trouble between them while they were going toward the barn. But immediately after they got to the barn he heard appellant say to deceased, "I don't want anything like that out of you, you Dutch son of a bitch," and about that time they started fighting. He was asked:

"How did they go to fighting, what did they do at the time they started fighting? A. It looked to me like they both made passes at each other about the same time, Mr. Ragsdale threw up his hands and fists like he was going to hit Mr. Kneisler and about that time Mr. Kneisler came around with his fork like that.

"Q. Did he hit at him with the fork part or fork handle? A. The fork handle, yes, sir.

"Q. Can you tell the jury whether or not he hit him? A. No, sir; I don't, he made two more passes at him and I saw Mr. Ragsdale reach for his back pocket and when he did that Mr. Kneisler wheeled around and started to run and he [meaning appellant] jerked his gun out of his pocket and fired the first shot and when he did that Ragsdale fired the second shot and hit him."

He testified that the first shot did not strike deceased, and when appellant fired the second shot deceased slumped over as he came around the corner of the barn and was staggering, and appellant fired

again, then rushed up on deceased and grabbed him and hit him on the head with the gun. The deceased died instantly and made no statement. Edwards was the only eyewitness to the killing who testified for the commonwealth. Another witness for the commonwealth testified that some time previous to the killing he had a conversation with appellant about the deceased, and appellant in referring to deceased said:

"If you don't believe it go bring the G—— d—— son of a bitch here and I will shoot him so full of holes that the undertaker can't pick him up."

There was also some evidence to the effect that deceased had sold appellant the land on which appellant lived and there was a due or past-due tax ticket against the land at the time of the conveyance, and it was claimed by appellant that deceased agreed to pay the tax ticket, but failed to do so and deceased had it to pay, and some time previous to the killing deceased and appellant had a quarrel about the ticket in the courthouse hall at Shepherdsville. Appellant testified that he and deceased were friendly and on good terms and no ill will existed between them as far as he knew. But on cross-examination he was asked in detail about whether they visited each other and what association, etc., they had had with each other for some time past, and he said that when they met in the road or saw each other they would say, "How do you do?" or some similar greeting, but he could not tell of any visits to each other's homes or other associations in accordance with the usual customs of neighbors living near each other as they did. Appellant denied making the threats against deceased, but admitted that they had an argument about the tax ticket. The facts and circumstances may have been sufficient to have warranted the jury to believe that there was some ill feeling between appellant and deceased, which was sufficient to furnish a motive for the killing.

Appellant testified in substance that when he and deceased went to the barn to turn the heifer out, deceased opened the barn door, and while they were waiting for the heifer to come out deceased started a conversation about a partnership fence, and he said to deceased:

" 'Charlie, or Dutchman; I came over here after my cow; I didn't come over here for any trouble,'

and about that time appellant made the remark that he had enough and says 'I will kill you,' and about that time I turned my head and looked that way and he had the pitchfork that was brought here, he had it up swinging at me like this with it and I didn't look around in time to dodge, I just caught the lick."

He further testified that deceased hit him on the head with the pitchfork handle and it broke in two and flew out a few feet from them and deceased ran a few steps toward the pitchfork and reached down to pick it up and came back with it and struck him again, and he was backing off and deceased kept sticking at him with the fork and striking him over the head with it. He said that at that time he did not know whether or not he had a gun; that he had changed clothes just before he left home, and the gun happened to be in the pocket of the trousers he had on. He said that he felt for his gun and found that he had it, and he shot the deceased in self-defense. Walter Stulck was at appellant's home at the time Edwards came and told him that his heifer was in deceased's barn, and Stulck went with appellant to the premises of the deceased. He testified that while appellant and deceased were standing at the barn, deceased said something about a partnership fence, and appellant said, "Listen, Dutchman, I didn't come over here for no trouble," and at this time deceased struck appellant with the pitchfork and broke the handle and ran and picked up the fork part and started back toward appellant, and appellant reached in his pocket and drew his gun.

· Appellant lived in Louisville before he moved to the farm where he resided at the time of the trouble, and he introduced as witnesses a number of his Louisville neighbors and acquaintances and fellow workers, and they all testified that appellant was a peaceable man and of good reputation.

Thus it will be seen that there was a conflict in the evidence. If it occurred in the way and manner described by the commonwealth witness Edwards, his testimony, together with other facts and circumstances tending to show an ill feeling between deceased and appellant, was sufficient evidence to sustain the verdict. The jury had the right to believe either theory

of the case it saw proper, and in such circumstances we have no right to disturb its finding.

The alleged improper evidence complained of consists of the following question asked by the commonwealth's attorney on recross-examination:

"I believe Mr. Carroll asked you if you were ever arrested or put in jail, didn't he? A. I believe he did, yes, sir. * * *

"Q. I will ask you if while working for the Brown Williamson Tobacco Company that you drove down with another man and he shot a man down and you all left and that if you warn't arrested on that occasion? A. No, sir."

It appears that these questions were asked by the commonwealth's attorney on cross-examination on an issue raised by defendant's counsel. But conceding, without deciding, that the questions were improper, no objections were made at the time, and this question is raised for the first time in brief for appellant. He waived his objections by failing to object at the time, and it now comes too late.

The complaint directed to the instruction is that the court defined to the jury the term "malice aforethought," and the definition as copied in the instruction, among other things, reads, "Malice aforethought means the pre-determination to commit the act of killing with legal justification or excuse * * *," instead of reading, "without legal justfication or excuse." It is conceded that this was a typographical error, but insisted that it was prejudicial. "Malice aforethought" is an element of murder, and the definition complained of was directed to the instruction on murder, under which appellant was not convicted. He was convicted for manslaughter under a separate and distinct instruction. The error, therefore, could not have been prejudicial. Taber v. Com., 82 S. W. 443, 26 Ky. Law Rep. 754, 757.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.